IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:13-cv-01162-RBJ-CBS

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a Wisconsin corporation,

      Plaintiff,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Minnesota corporation,
THE TRAVELERS INDEMNITY COMPANY, a Connecticut corporation,

      Defendants.

---

## PLAINTIFF AMERICAN FAMILY MUTUAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff, American Family Mutual Insurance Company ("American Family"), by and through its attorneys, Lambdin & Chaney, LLP, hereby moves this Court for partial summary judgment pursuant to F.R.C.P. 56(a), to determine as a matter of law the following:

**1.** Defendants St. Paul Fire & Marine Insurance Company ("St. Paul") and The Travelers Indemnity Company ("Travelers") each owed Roslyn Court at Stapleton, LLC d/b/a T.P. Development, LLC a/k/a Roslyn Court Development, LLC a defense in the lawsuit filed in Denver District Court, civil action number 2009 CV 977; and

**2.** Defendants were obligated to fully defend Roslyn Court at Stapleton, LLC d/b/a T.P. Development, LLC a/k/a Roslyn Court Development, LLC in said lawsuit,

without contribution from American Family, whose polices were excess to the policies issued by St. Paul and Travelers.

The reasons supporting the Motion follow:

## I.    Introduction

This is an action for declaratory relief, breach of contract, and equitable subrogation arising from an underlying lawsuit filed in Denver County District Court, civil action number 2009 CV 977, captioned *Roslyn Court at Stapleton Homeowners Association v. Roslyn Court at Stapleton, LLC d/b/a T.P. Development, LLC a/k/a Roslyn Court Development, LLC, a Colorado limited liability company; Jacqueline G. Peterson, individually; and Shaw Construction, LLC*, hereinafter the "Underlying Lawsuit." In the Underlying Lawsuit, Roslyn Court at Stapleton Homeowners Association (hereinafter the "HOA") asserted claims involving a residential development located in Denver, Colorado (the "Project").

Roslyn Court at Stapleton, LLC ("RCS") was the developer for the construction of the Project, and contracted with Shaw Construction, LLC ("Shaw") to act as the general contractor for the construction of the Project. The contract between RCS and Shaw required Shaw to maintain, for all times during construction and for two years after substantial completion of the Project, liability insurance naming RCS as an additional insured, and providing completed operations coverage with limits of $2,000,000 per occurrence. The contract further provided: "All insurance shall be primary, and insurance carried by additional insurers shall be non-contributing."

Plaintiff American Family issued contracts of insurance to RCS. Defendant St. Paul issued contracts of insurance to Shaw with limits of $1 million for each event and $2 million for products and completed work, covering the time periods July 15, 2003 through July 15, 2005. These policies contained an endorsement which made RCS an additional insured under those policies, and made the St. Paul policies primary and non-contributory over any other insurance issued to RCS. Defendant Travelers issued contracts of insurance to Shaw with limits of $1 million for each occurrence, covering the time periods July 15, 2005 through June 1, 2007. These policies contained an endorsement which made RCS an additional insured under those policies, and made the Travelers policies primary and non-contributory over any other insurance issued to RCS.

The Underlying Lawsuit was filed on January 21, 2009, and amended on January 28, 2010. In the Underlying Lawsuit, filed against both RCS and Shaw, the HOA alleged numerous construction defects resulting in property damage. American Family retained counsel for RCS and defended RCS under a reservation of rights, and Defendants contributed (partially but not fully) to payment of RCS's defense costs. Defendants also defended Shaw Construction, and over the objection of RCS paid $1,000,000 to settle the HOA's claims against Shaw. Upon making this payment, Defendants took the position that their indemnity obligations to RCS were satisfied by an alleged exhaustion of limits in payment for Shaw's settlement, and Defendants refused to make any contribution to settle the claims still pending against RCS. After the

Defendants' refusal to indemnify RCS, Plaintiff American Family paid $820,000 to settle claims against RCS.  This action followed.

## II.   American Family's Statement of Material Facts

1.   The HOA brought suit against the developer (RCS) and general contractor (Shaw) alleging *inter alia* that the Project was defectively constructed.  ***Ex. 1***, *Amended Complaint and Jury Demand, 09CV977.*

2.   On April 14, 2003, RCS (Owner) and Shaw (Contractor) entered into a Standard Form of Agreement Between Owner and Contractor for the Project with an attached Addendum.  ***Ex. 2*** ("the Contract").

3.   The Addendum to the Contract provides as follows:

¶ 13   Notwithstanding any provision in the Contract to the contrary, at all times during construction, and for a period of two years after Substantial Completion, the Contractor shall obtain and maintain in full force and effect . . . the following valid and enforceable policies . . . naming the Owner . . . as additional insureds:

c.   Comprehensive general and comprehensive auto liability (occurrence based policies) governing the following matters:

(2)   Property damage: $2 million per occurrence

(4)   Completed Operations Coverage;

(6)   "Broad Form" Property Damage Endorsement;

(8)   Contractual Liability Insurance

. . . All insurance shall be primary, and insurance carried by additional insureds shall be non-contributing.

***Ex. 2***, Addendum ¶ 13.

4.  On behalf of the Owner, the Contract is signed by Jacqueline Peterson as the manager for TP Development, LLC. TP Development, LLC is the managing member of Rosyln Court @ Stapleton, LLC. ***Ex. 2***.

5.  The Underlying Lawsuit contained the following allegations in the Amended Complaint:

> ¶ 5    Defendant Roslyn Court at Stapleton d/b/a TP Development, LLC, a/k/a Roslyn Court Development, LLC (hereinafter "TP Development") is a Colorado limited liability company which has conducted business in Denver, Colorado. TP Development was the declarant, developer and builder-vendor of Roslyn Court.

> ¶ 9    Upon information and belief, the various subcontractors and independent contractors involved in the development and construction of Roslyn Court and responsible for creating the defectively constructed elements described elsewhere in the *Complaint*, pursuant to express or implied agreement were delegated a part of these development and construction activities by TP Development, Peterson and Shaw.

> ¶ 10   Defendants TP Development and Peterson wrongfully represented, caused to be represented, and/or ratified representations that were made to the Association and/or the Member unit owners (and/or their predecessors in interest), in their capacity as actual or potential consumers, or their successors in interest, and/or wrongfully failed to disclose, caused the failure to disclose, and/or ratified the nondisclosure of material facts, as described elsewhere in this *Complaint*.

> ¶ 11   At all times material to this *Complaint*, each of the Defendants was acting through his, her, or its officers, directors, employees, agents and other authorized representatives and, as such, each is vicariously liable for the conduct, omissions and wrongful acts of its officers, directors, employees, agents and other authorized representatives.

> ¶ 12   Among themselves and others, Defendants consciously conspired and/or deliberately pursued a common plan or design to commit the

tortious conduct alleged herein, rendering them all jointly and severally liable for damages resulting from such conduct.

¶ 15    Defendants and their subcontractors built, developed, sold, and worked on the units and common elements that form Roslyn Court. Defendants incorporated and controlled Association until July, 2005 at which time they transitioned control to a board of directors elected by the homeowners.

¶ 16    Sometime after the elected directors assumed control and after the property in the community had been put to its intended use, property damage resultant from certain construction defects slowly became apparent at particular locations in the community. The property damage caused by certain of the construction deficiencies identified to date include but are not limited to:

Improper site grading and drainage, defective balcony waterproofing, improperly constructed siding, improperly constructed flatwork, improper installation and/or failure to install adequate HVAC systems to the Association, improper insulation in the unit walls, leaking doors and windows, and concrete failure. Upon information and belief, these damages and others as will be proven at trial are the result of Defendants' wrongful conduct during the construction and sale of the homes and common property. Some or all of these issues and the resultant damages arose from errors or omissions by Defendants during the time they controlled Association.

*Ex. 1.*

6.    The HOA asserted the following claims for relief:

First Claim for Relief –    Negligence as to all Defendants

Second Claim for Relief – Negligence Per Se as to Defendants TP Development and Shaw

Third Claim for Relief –   Breach of Warranty of Habitability as to all Defendants

Fourth Claim for Relief -  Breach of Fiduciary Duty as to TP Development and Peterson

<table>
<tr><td>Fifth Claim for Relief -</td><td>Negligent Misrepresentation as to Defendants TP Development and Peterson</td></tr>
<tr><td>Sixth Claim for Relief -</td><td>Deceptive Trade Practices as to Defendants TP Development and Jacqueline G. Peterson</td></tr>
<tr><td>Seventh Claim for Relief -</td><td>Negligent Violation of CCIOA as to Defendants TP Development and Jacqueline G. Peterson</td></tr>
</table>

*Ex. 1*.

7.      In addition to costs, expenses, attorney fees and interest, the HOA requested monetary damages for the property damage and non-economic damages resulting from the property damage, including annoyance, discomfort, inconvenience, aggravation and loss of use and enjoyment. *Ex. 1*, *Prayers for Relief*.

8.      Plaintiff American Family issued a contract of insurance to TP Development, LLC, policy number 05 XC8389, effective 07/27/2003 to 07/27/2004.  *Declaration Pages attached as Ex. 3*.  At all pertinent times, the policy in effect contained a Commercial General Liability Coverage Form, CG 00 01 10 01, attached as *Ex. 4*.

9.      Plaintiff American Family issued a contract of insurance to Roslyn Court at Stapleton, LLC, policy number 05 XD9818, effective 07/21/2004 to 07/21/2005.  *Declaration Pages attached as Ex. 5*.  At all pertinent times, the policy in effect contained a Commercial General Liability Coverage Form, CG 00 01 10 01.  *Ex. 4*.

10.     Commercial General Liability Coverage Form, CG 00 01 10 01, contained in Plaintiff's policies, provides that the American Family policies are excess over "any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement." *Ex. 4*, pp. 8-9.

11.     Defendant St. Paul issued contracts of insurance to Shaw with limits of $1 million for each event and $2 million for products and completed work: (a) policy number KC08300110, effective 07/15/2003 to 07/21/2004, and (b) policy number KK08302022, effective 07/15/2004 to 07/15/2005, *Declaration Pages attached as Ex. 6*.  At all pertinent times, these policies included Contractors Commercial General Liability Protection Coverage, attached as *Ex. 7*.

12.     These two policies - policy number KC08300110 and policy number KK08302022 - included an endorsement titled Additional Protected Persons Endorsement – Contractors General Liability – Including Completed Work, attached as *Ex. 8*.

13.     The Additional Protected Persons Endorsement included, as an "Additional    protected person," "any person or organization you are required in a written contract to show as an additional protected person." The endorsement provided additional insured coverage for RCS arising

out of "[Shaw's] work for [RCS]" and "[Shaw's] completed work for [RCS] if

[Shaw's ] contract or agreement requires such coverage." ***Ex. 8***.

14.    The Additional Protected Persons Endorsement also provided:

> We'll consider this insurance to be primary to and non-contributory with the insurance issued directly to additional protected persons below if: Your contract specifically requires that we consider this insurance to be primary or primary and non-contributory…

***Ex. 8***.

15.    The two St. Paul policies - policy number KC08300110 and policy number

KK08302022 – also included Umbrella Excess Liability Protection

Coverage with limits of $10 million for each event and $10 million for

products and completed work. *Declaration Pages attached as **Ex. 9***.

16.    The Umbrella Excess Liability Protection Coverage provides under **Who Is**

**Protected Under This Agreement** on page 10 of 27, attached as ***Ex. 10***:

**Other protected persons under your Basic Insurance.**   Any other person or organization that's a protected person under your Basic Insurance is also a protected person under this agreement.   But the protection under this agreement for each such person or organization is limited to the type and scope of coverage provided by your Basic Insurance.

If any such person or organization is included as a protected person under your Basic Insurance because:

- a written contract has been made with you before the bodily injury or property damage happens or the offense is committed; and

- that contract requires you to provide liability insurance on behalf of that person or organization;

we'll consider that person or organization to be a protected person under this agreement.  But only to the extent that the limits of coverage required by the contract exceed your Basic Insurance limits of coverage, subject to the limits of coverage for this agreement.

*Ex. 10*, p. 10.

17.     Defendant Travelers issued contracts of insurance to Shaw with limits of $1 million for each occurrence: (a) policy number DT-CO-7566B228-IND-05, effective 07/15/2005 to 06/01/2006, and (b) policy number DT-CO-7566B228-IND-06, effective 06/01/2006 to 06/01/2007.  *Declaration Pages attached as Ex. 11*.  At all pertinent times, these policies included a Commercial General Liability Coverage Form, CG 00 01 10 01, attached as *Exhibit 4*.

18.     These two policies - policy number DT-CO-7566B228-IND-05 and policy number DT-CO-7566B228-IND-06 - included an endorsement titled Blanket Additional Insured (Contractors), attached as *Ex. 12*.  *See Ex. 11*, *Listing of Forms, Endorsements and Schedule Numbers*.

19.     The Blanket Additional Insured (Contractors) endorsement provides that an insured includes "any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement" with respect to liability caused by Shaw's work.  *Ex. 12*.

20.     The Blanket Additional Insured (Contractors) endorsement provides that it applies Shaw's work causing property damage included in "products-

completed operations hazard" if Shaw was "required to provide such coverage for the additional insured by a written contract or written agreement in effect during this policy period." ***Ex. 12***.

21.    The Blanket Additional Insured (Contractors) endorsement further provides:

> Any coverage provided by this endorsement to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured… unless a written contract or written agreement in effect during this policy period… specifically requires that this insurance apply on a primary or non-contributory basis.

***Ex. 12***.

22.    In a letter dated June 8, 2004, the Project architect determined that the Project was substantially completed.  ***Ex. 13***.

## III.    Legal Standards

### a.  Standard of Review

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts. ***Celotex Corp. v. Catrett***, 477 U.S. 317, 323 (1986), *citing* Fed. R. Civ. P. 56(c).  If the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists, then the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); ***White v. York Intern. Corp.***, 45 F.3d 357, 360 (10th Cir. 1995).

### b.  Standards Governing the Duty to Defend

A duty to defend arises "from allegations in the complaint, which if sustained, would impose a liability covered by the policy."  ***Cotter Corp. v. American Empire Surplus Lines Ins. Co.***, 90 P.3d 814, 829 (Colo. 2004), *citing **Hecla Mining Co. v. N.H. Ins. Co.**,* 811 P.2d 1083, 1089 (Colo. 1991).  Under Colorado law:

> [a]n insurer seeking to avoid its duty to defend an insured bears a heavy burden.  An insurer's duty to defend arises when the underlying complaint against the insured alleges any facts that might fall within the coverage of the policy. . . . Where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim.

***Greystone Constr. v. Nat'l Fire and Marine, Ins. Co.,*** 661 F.3d 1272, 1284 (10th Cir. 2011), *citing **Compass Ins. Co. v. City of Littleton***, 984 P.2d 606, 613-14 (Colo. 1999).  Thus, the insurer bears the burden of establishing that "the allegations in the complaint are solely and entirely with the exclusions in the insurance policy" and that any exceptions to the exclusions do not restore coverage.  ***Cotter***, 90 P.3d at 829.

To conclude there is no duty to defend, the Court must ask whether, based on the allegations in the Underlying Lawsuit, "no factual or legal basis" exists on which Defendants might be required to indemnify RCS.  ***Id.***  To avoid a duty to defend, St. Paul and Travelers must prove that the allegations "are solely and entirely within the" exclusionary endorsements, and that "there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured."  ***Hecla Mining Co. v. N.H. Ins. Co.***, 811 P.2d 1083, 1089 (Colo. 1991). However, once it is established that

coverage exists under the initial grant of coverage, the burden is on the insurer to prove coverage is removed by an exclusion. ***Leprino Foods Co. v. Factory Mut. Ins. Co.***, 453 F.3d 1281, 1287 (10th Cir. 2006).

### c. Standards Governing Interpretation of Policy Language

Because this Court's subject matter jurisdiction is based on diversity of citizenship of the parties, the Court applies Colorado's substantive law governing the interpretation of insurance policy language. *See **Gasperini v. Ctr. For Humanities, Inc.***, 518 U.S. 415, 426-27 (1996). Under Colorado law, insurance policies are construed under the same traditional principles that govern the interpretation of any contract. ***Compass Ins. Co. v. City of Littleton***, 984 P.2d 606, 613 (Colo. 1999). Thus, courts must enforce the plain language of the policy unless it is ambiguous. ***Hoang v. Assurance Co. of Am.***, 149 P.3d 798, 801 (Colo. 2007).

A court may neither rewrite an unambiguous policy nor limit its effect by a strained construction. ***Terranova v. State Farm Mut. Auto. Ins. Co.***, 800 P.2d 58, 60 (Colo. 1990). Policy provisions should be read to avoid ambiguities if possible and the language should not be tortured to create ambiguity. ***Wota v. Blue Cross & Blue Shield of Colo.***, 831 P.2d 1307, 1309 (Colo. 1992). A mere disagreement between the parties regarding the meaning of a policy term does not create an ambiguity. ***State Farm Mut. Auto. Ins. Co. v. Stein***, 940 P.2d 384, 387 (Colo. 1997). In the absence of ambiguity, intent is to be determined by the language of the policies themselves, not extrinsic evidence. *See **Union Ins. Co v. Hottenstein***, 83 P.3d 1196, 1199 (Colo. App. 2003).

#### d. The Legal Distinction Between Primary and Excess Coverage

In general, a primary liability policy "provides the first layer of coverage, attaching immediately upon the happening of an occurrence or when a claim is made." ***Apodaca v. Allstate Ins. Co.***, 255 P.3d 1099, 1103 (Colo. 2011). By contrast, excess and umbrella policies "protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." ***Id.*** An excess policy pays benefits only after the limits of the primary or underlying insurance policy have been exhausted. ***Id.*** Excess policies assume the less frequent risk that an insured will be liable for a judgment that exceeds the primary policy's limits. ***Id.***

An umbrella policy is a distinct type of excess liability policy. ***Id.*** However, in addition to providing excess liability coverage, an umbrella policy typically also provides primary coverage for certain risks that an underlying liability policy does not cover. ***Id.***

#### e. Purpose and scope of a Commercial General Liability Policy.

Commercial General Liability Policies (CGL) envision two kinds of risk arising from a contractor's work. The first is the business risk that a contractor will have to pay to repair faulty workmanship that is unsatisfactory to a homebuyer. Liability policies do not insure the insured's work or guarantee the quality of the work. This risk is uninsurable and excluded under CGL policies. ***McGowan v. State Farm Fire & Cas. Co.***, 100 P.3d 521 (Colo. App. 2004); see also ***United Fire & Cas. Co. v. Boulder Plaza Residential, LLC***, 633 F.3d 951, 959 (10th Cir. 2011) (CGL polices do not act as performance bonds to ensure a contractor performs quality work, they are intended to provide coverage for

injuries arising from accidents).  The second type of risk is that the construction, once completed, may cause bodily injury or property damage to property other than the completed construction itself.  ***Greystone Constr. v. Nat'l Fire and Marine, Ins. Co.***, 661 F.3d 1272, 1284 (10th Cir. 2011).  This type of risk may be covered by a CGL policy if not otherwise excluded.

### IV. Argument

#### a. The Underlying Lawsuit allegations triggered a duty to defend in all the policies issued by St. Paul and Travelers.

As set forth above, Defendants' policies provided coverage to RCS for claims "arising out of [Shaw's] work," including "completed operations" coverage.  SMF ¶¶ 12-14, 17-20, ***Ex. 8*** and ***Ex. 12***.  Accordingly, the scope of the additional insured coverage provided by Defendants to RCS was identical to the coverage Defendants provided to Shaw, the general contractor for the Project.

Under Colorado law, allegations of defective construction resulting in property damage trigger a duty to defend a general contractor.  In ***Greystone***, ***supra***, the 10th Circuit, interpreting Colorado law, analyzed CGL policies issued to a builder who had been sued for defective workmanship resulting in property damage, and held that "damage solely to nondefective work, caused by a subcontractor's faulty workmanship, may be an 'accident' or 'occurrence' as defined by a typical CGL policy."  ***Greystone***, 661 F.3d at 1286.

The policies applied to "bodily injury" or "property damage" caused by an "occurrence."  ***Id.*** at 1278.  In those policies, "occurrence" was defined as "an accident,

including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* The Court further concluded:

> …the CGL policies at issue may cover damage to nondefective property arising from poor workmanship. In our view, the policyholders' complaints adequately allege an "accident" that fits within the policies' definition of a covered "occurrence." Accordingly, we hold that injuries flowing from improper or faulty workmanship constitute an occurrence so long as the resulting damage is to nondefective property, and is caused without expectation or foresight. As we explain further below, nondefective property is property that has been damaged as a result of poor workmanship.

*Id.* at 1284. The Court held that "the damage to the contractor's nondefective work – even if arising out of poor workmanship – may fall under the CGL policy's initial grant of coverage, even though coverage may ultimately be withdrawn through one of the policy's exclusions." *Id.* at 1290.

In this case, the HOA in the Underlying Lawsuit alleged negligent workmanship and a variety of construction defects flowing from such workmanship, which resulted in property damage to nondefective work. *See Statement of Material Facts* ("SMF"), ¶¶ 5-7; *Ex. 1*. The St. Paul policies state: "We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that… is caused by an event." *Ex. 7*. According to St. Paul, "event" is defined exactly as "occurrence" was defined in the *Greystone* policies. *See Ex. 14*, *Travelers' March 5, 2012 coverage position letter*, p. 2. The Travelers policies state they apply to "bodily injury" or "property damage" caused by an "occurrence," which has the identical definition as in the *Greystone* policies. *Ex. 4*. As in *Greystone*, the allegations in the

Underlying Lawsuit allege an "accident" or "occurrence" (the defective workmanship) resulting in "property damage."

Defendants do not dispute this, and in fact participated in the defense of RCS under a reservation of rights. *See **Ex. 14***. St. Paul, however, asserts that because the HOA alleged it did not assume control of the Association until July 2005, and further allege that thereafter "property damage resultant from certain construction defects slowly became apparent at particular locations in the community," that the allegations of the Amended Complaint contain no allegations of "physical damage to tangible property of others" within St. Paul's policy periods. *See **Ex. 15***.

St. Paul's argument is based on the ***assumption*** that, because the HOA alleges it ***observed*** property damage after July 2005, that such damage must have ***in fact*** occurred after July 2005. The Underlying Lawsuit complaint alleged improper site grading and drainage, defective balcony waterproofing, improperly constructed siding, improperly constructed flatwork, improper installation and/or failure to install adequate HVAC systems to the Association, improper insulation in the unit walls, leaking doors and windows, and concrete failure. Logically, if such defects resulted in property damage, as alleged, such property damage began occurring from the time the defective work was completed – regardless of when the HOA claims to have first observed visible evidence of property damage. Accordingly, St. Paul's position is faulty and the allegations of the Underlying Lawsuit do contain allegations of property damage occurring within St. Paul's policy periods, since the property damage necessarily began

at the time the defective construction was completed and continued worsening over time.

Defendants therefore owed RCS, under each of their respective policies, a duty to defend based on the Amended Complaint allegations in the Underlying Lawsuit.

### b. Defendants' liability policies were primary and Plaintiff's policies were excess.

Since RCS was insured by both its own policies (issued by American Family) and Shaw's policies (issued by Defendants) as an additional insured, the next issue is whether the policies were co-primary, or whether certain policies were primary and certain policies excess. Under the provisions of the contract between RSC and Shaw, and the insurance contracts, Defendants' policies were clearly primary and non-contributory, with Plaintiffs' policies being excess.

RCS entered into a contract with Shaw. The contract was signed by Jacqueline Peterson as the manager for TP Development, LLC, with TP Development, LLC acting as the managing member of Roslyn Court @ Stapleton, LLC. SMF ¶ 4, *Ex. 2*. The contract between RCS and Shaw required Shaw to obtain liability coverage naming RCS as an additional insured, with the following requirements: $2,000,000 per occurrence coverage; completed operations coverage; "Broad Form" Property Damage Endorsement; and, contractual liability insurance. The contract also provided that the insurance obtained by Shaw "shall be primary, and insurance carried by additional insureds shall be non-contributing." SMF ¶ 3, *Ex. 2*.

St. Paul's policies covered the July 15, 2003 through July 15, 2005 timeframe, and contained an Additional Protected Persons endorsement. SMF ¶¶ 11-12, *Ex. 6* and *Ex. 8*. The Additional Protected Persons Endorsement included, as an "Additional protected person," "any person or organization you are required in a written contract to show as an additional protected person." SMF ¶ 13, *Ex. 8*. The Contract required Shaw to show RCS as an additional protected person. SMF ¶ 3, *Ex. 2*. The endorsement also provided additional insured coverage for RCS arising out of "[Shaw's] work for [RCS]" and "[Shaw's] completed work for [RCS] if [Shaw's ] contract or agreement requires such coverage." SMF ¶ 13*, Ex. 8*. The Contract here required Shaw to obtain coverage for completed operations. SMF ¶ 3, *Ex. 2*.

The Additional Protected Persons Endorsement stated: "We'll consider this insurance to be primary to and non-contributory with the insurance issued directly to additional protected persons below if: Your contract specifically requires that we consider this insurance to be primary or primary and non-contributory…" SMF ¶ 14*, Ex. 8*. The Contract between Shaw and RSC specifically states: "All insurance shall be primary, and insurance carried by additional insureds shall be non-contributing." SMF ¶ 3, *Ex. 2*.

Finally, the umbrella coverage under St. Paul's policies is primary to American Family's policies. Pursuant to the terms of the umbrella coverage, RCS is a "protected person" under the umbrella insurance "to the extent that the limits of coverage required by the contract exceed your Basic Insurance limits of coverage." SMF ¶ 16, *Ex. 10*. Here, the Contract between RCS and Shaw required ***$2,000,000*** in coverage, ***not*** $1,000,000;

therefore, the umbrella policy "drops down" to fill the gap in the contractually required coverage. *See, e.g.,* ***Fidelity & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.***, 189 F.Supp.2d 1212, 1223 (D. Kan. 2002). Further, the umbrella policy, by its terms, assumes a duty to defend if "your Basic Insurer paid its limit of coverage for the event or offense that caused the claim or suit." ***Ex. 10***, p. 6. Accordingly, to the extent St. Paul's basic limits were exhausted by settlement payments (which Plaintiff denies), such payment would trigger a duty to defend under St. Paul's umbrella policy.

Similar to the St. Paul policies, the Travelers policies (effective July 15, 2005 through Jun 1, 2006), contained a Blanket Additional Insured endorsement. SMF ¶¶ 17-18, ***Ex.*** 11 and Ex. ***12***. The Blanket Additional Insured (Contractors) endorsement provides that an insured includes "any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement" with respect to liability caused by Shaw's work. SMF ¶ 19, ***Ex. 12***.

The Blanket Additional Insured (Contractors) endorsement provides that it applies to Shaw's work causing property damage included in "products-completed operations hazard" if Shaw was "required to provide such coverage for the additional insured by a written contract or written agreement in effect during this policy period." SMF ¶ 20, ***Ex. 12***. It also provides that Defendant's insurance is "excess over any other valid and collectible insurance available to the additional insured… unless a written contract or written agreement in effect during this policy period… specifically requires that this insurance apply on a primary or non-contributory basis." SMF ¶ 20, ***Ex. 12***. As the Court can see,

Defendants' policies, **by their terms**, were meant to apply on a primary and non-contributory basis.

The Contract between RCS and Shaw required Shaw to obtain the required coverages "at all times during construction, and for a period of two years after Substantial Completion." SMF ¶ 3, **Ex. 2**. Accordingly, the Contract was "in effect" for two years following substantial completion (which occurred on June 8, 2004, see **Ex. 13**), or through June 8, 2006. The Contract was therefore in effect during Travelers policy periods, which by its terms makes its coverage apply on a primary and non-contributory basis.

Further, Plaintiff's policies provide they are excess over "any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement." SMF ¶ 10, **Ex. 4**. Defendants' policies contain no such "other insurance" clause that would render American Family's policies either primary or co-primary. Therefore, the terms of Plaintiff American Family's policies make Defendants' policies primary and American Family's policies excess.

Accordingly, Defendant's policies, by the plain terms of the Contract and applicable insurance policies, are primary and non-contributory over any other available insurance, including American Family's policies.

## V.    Conclusion

Summary judgment in Plaintiff's favor is appropriate, because (1) the allegations of the Underlying Lawsuit trigger a duty to defend under each of Defendants' respective

policies; and (2) the plain terms of the Contract between RCS and Shaw, and the applicable insurance policies, operate to make Defendants' policies primary and Plaintiff's policies excess.

WHEREFORE, for the foregoing reasons, Plaintiff requests the Court to grant this Motion and issue an Order finding that:

(1)  Defendants owed a duty to defend Roslyn Court at Stapleton, LLC, under each of their respective policies; and

(2)  Defendants' duty to defend, under each of their respective policies, was primary and non-contributory, and that Plaintiff American Family's policies were excess to Defendants' policies.

DATED this 2nd day of September, 2014.

Respectfully submitted,

LAMBDIN & CHANEY, LLP

By: *John W. Fairless*
      L. Kathleen Chaney, Esq.
      John W. Fairless, Esq.
      Jerad A. West, Esq.
      4949 S. Syracuse Street, Suite 600
      Denver, Colorado 80237
      Telephone:   (303) 799-8889
      Facsimile:    (303) 799-3700
      Email:       kchaney@lclaw.net

*Attorneys for American Family Mutual Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2014, I electronically filed the foregoing **PLAINTIFF AMERICAN FAMILY MUTUAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Nancy L. Pearl, Esq.
Laura Trask Schneider, Esq.
Pearl Schneider, LLC
999 18th Street, South Tower, Suite 1850
Denver, CO 80202

_____
John W. Fairless